**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

WARREN ROSENFELD,

         Petitioner,

vs.                              Case No.:     3:18-cv-607-J-34JRK
                                                 3:14-cr-73-J-34JRK

UNITED STATES OF AMERICA,

         Respondent.

_____/

<u>ORDER</u>

      This case is before the Court on Petitioner Warren Rosenfeld's Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence. (Civ. Doc. 9, Amended § 2255 Motion).[1] Rosenfeld was convicted after a jury trial of one count of conspiracy to commit wire fraud and three counts of substantive wire fraud. Rosenfeld now raises three claims of ineffective assistance of counsel, as well as one claim that the Court lacked subject matter jurisdiction over the criminal proceedings. The United States has responded in opposition (Civ. Doc. 12, Response), and Rosenfeld has filed a reply (Civ. Doc. 13, Reply). The Court has also considered three "declarations" from Rosenfeld in support of § 2255 relief. (Civ. Doc. 3, First Declaration; Civ. Doc. 8, Amended Second Declaration; Civ. Doc. 14, Third Declaration). Thus, the case is ripe for a decision.

      Pursuant to 28 U.S.C. § 2255 and Rule 8(a) of the Rules Governing Section 2255 Proceedings[2], the Court has considered the need for an evidentiary hearing and

_____

[1]     Citations to the record in the underlying criminal case, <u>United States v. Holland, et al.</u>, No. 3:14-cr-73-J-34JRK, will be denoted "Crim. Doc. __." Citations to the record in the civil § 2255 case, No. 3:18-cv-607-J-34JRK, will be denoted "Civ. Doc. __."

determines that a hearing is not necessary to resolve the merits of this action. See Rosin v. United States, 786 F.3d 873, 877 (11th Cir. 2015) (an evidentiary hearing on a § 2255 motion is not required when the petitioner asserts allegations that are affirmatively contradicted by the record or patently frivolous, or if in assuming the facts that he alleges are true, he still would not be entitled to any relief); Patel v. United States, 252 F. App'x 970, 975 (11th Cir. 2007).[3] For the reasons set forth below, Rosenfeld's Amended § 2255 Motion is due to be denied.

## I.     Background

On April 17, 2014, a federal grand jury returned a 17-count indictment against Rosenfeld and three codefendants: Mitchell Holland, Juan Luis Hernandez Rill, and Rondell Scott Hedrick. (Crim. Doc. 1, Indictment). Each of the charges "related to a longstanding wire-fraud scheme." United States v. Holland, 722 F. App'x 919, 921 (11th Cir. 2018). With respect to Rosenfeld, the Indictment charged him with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1349 and 1343 (Count One), and three counts of substantive wire fraud, in violation of § 1343 (Counts Three, Four, and Nine).

> More particularly, the indictment alleged as follows. Beginning around June 2009, Holland and Rosenfeld participated in a fraudulent scheme to "lease" fake certificates of deposit (CDs) and "proof of funds" letters to borrowers unable to obtain traditional forms of financing. Holland and Rosenfeld convinced their clients that the leased CDs and proof-of-funds letters could be used to obtain loans or other financing, either as collateral

---

[2]     Rule 8(a) of the Rules Governing Section 2255 Proceedings expressly requires the Court to review the record, including any transcripts and submitted materials, to determine whether an evidentiary hearing is warranted before resolving a § 2255 motion.

[3]     Although the Court does not rely on unpublished opinions as precedent, they may be cited throughout this Order as persuasive authority on a particular point. Rule 32.1 of the Federal Rules of Appellate Procedure expressly permits the Court to cite to unpublished opinions that have been issued on or after January 1, 2007. Fed. R. App. P. 32.1(a).

or otherwise. Once an agreement was reached, Holland and Rosenfeld obtained fraudulent financial documents from Unistate, a shell corporation purporting to be a financial institution headquartered in New Zealand.

Each client paid an "arrangement fee" of between $150,000 and $622,500 for Holland and Rosenfeld to secure a leased financial instrument, which would be held in the client's name for 60 days. Theoretically, this initial arrangement fee was to be kept in escrow for five days after provision of the leased instrument to allow time for the client to receive a refund should the documents prove unsatisfactory. In practice, though, Holland and Rosenfeld never waited the full five-day period before requesting disbursement. The arrangement fee was divided among the scheme's participants. At the end of the 60-day period, the client could extend the lease for up to a year by paying another much larger fee, ostensibly with funds obtained through use of the leased documents.[4] Not a single client ever paid this second fee, likely because none were able to use the fake documents in any way.

Holland, 722 F. App'x at 921–22 & n.1 (footnote in original but renumbered).

Rosenfeld pled not guilty to the charges and proceeded to trial. At trial, the government presented testimony from several of the fraud victims (e.g., Crim. Doc. 379, Trial Tr. Vol. II; Crim. Doc. 380, Trial Tr. Vol. III; Crim. Doc. 381 Trial Tr. Vol. IV), as well as two co-conspirators, Glen Eliot Smith and Christopher Jaijairan, who described the fraudulent scheme (Crim. Doc. 382, Trial Tr. Vol. V at 126-335; Crim. Doc. 383, Trial Tr. Vol. VI at 11-203). The government also presented the testimony of an expert witness, William Kerr, Trial Tr. Vol. VI at 207-309, who explained that each of the financial

---

4

According to the indictment, Holland and Rosenfeld executed this scheme against individual victims in the following way: Dwight Jenkins received a fraudulent $10 million "CD and Proof of Funds Account" for a $150,000 arrangement fee; George Sayar received a $200 million "leased CD" for an initial fee of $622,500; Justin Nemec received a $4 million "leased CD" for an initial payment of $375,000; Brian Winum received a $100 million "leased CD" in exchange for an initial payment of $300,000; Ronald Sapp received a $100 million "leased CD" for an initial arrangement fee of $400,000; and Aurora Asset Management, LLC received a $100 million "leased CD" for an initial fee of $450,000. The victims were led to believe they could monetize the leased instruments, but were unable to do so.

Holland, 722 F. App'x at 922 n.1.

instruments that Rosenfeld and his coconspirators sold to the victims were worthless. Additionally,

> Rosenfeld testified in his own defense. During his testimony, he made statements that became the basis of an obstruction-of-justice-based sentence enhancement…. Among other things, during direct examination, he claimed he had been "contacted by a Secret Service agent that was looking for expert witnesses." On cross-examination, the government inquired as to the nature of Rosenfeld's role as an expert witness. When asked where he testified as an expert, Rosenfeld could not clearly recall, but said he believed it was in the Eastern District of New York in Queens. When pressed further on the matter, Rosenfeld conceded that he did not testify in court, was not even in New York when the trial in question happened, and claimed that he only used the term "expert" on direct because he was answering questions about his industry in an interview with a federal prosecutor.

> At the close of the government's case in chief, Holland and Rosenfeld each moved for judgment of acquittal, but their motions were denied. The motions were renewed before the case was submitted to the jury, and again denied.

Holland, 722 F. App'x at 924. After hearing nearly two weeks of testimony, the jury found Rosenfeld guilty on all counts. (Crim. Doc. 175, Jury Verdict).

According to the Presentence Investigation Report (PSR), Rosenfeld's total offense level under the United States Sentencing Guidelines was 36 and his Criminal History Category was I, yielding an advisory sentencing range of 188 to 235 months in prison. (Crim. Doc. 211, PSR at ¶ 98). The total offense level consisted of the following: a base offense level of 7 under U.S.S.G. § 2B1.1(a)(1); a 20-level enhancement under § 2B1.1(b)(1)(K) because the Probation Officer determined that the loss amount was between $7 million and $20 million ($10,523,978 to be exact); a 2-level enhancement under § 2B1.1(b)(2)(A)(ii) because the offense involved a mass marketing scheme; a 2-level enhancement under § 2B1.1(b)(10)(C) because the offense involved sophisticated means; a 3-level enhancement under § 3B1.1(b) because Rosenfeld played a managerial

or supervisory role in the conspiracy; and a 2-level obstruction-of-justice enhancement under § 3C1.1 because Rosenfeld gave false testimony at trial. PSR at ¶¶ 59-69.

At the sentencing hearing, Rosenfeld contested the loss amount, the mass marketing enhancement, the role enhancement, and the obstruction-of-justice enhancement, among other things. (See Crim. Doc. 392, Sentencing Tr. Vol. I; Crim. Doc. 393, Sentencing Tr. Vol. II; Crim. Doc. 458, Sentencing Tr. Vol. III). Rosenfeld was partially successful. The Court overruled the 2-level mass marketing enhancement and the 3-level role enhancement. (Crim. Doc. 237, Statement Regarding Guidelines Determination). The Court also determined that the loss amount attributable to Rosenfeld was approximately $3.8 million rather than $10.5 million, resulting in an 18-level enhancement instead of a 20-level enhancement. Id.; (see also Crim. Doc. 238, Restitution Amount Finding). But Rosenfeld was less successful in challenging the obstruction-of-justice enhancement.

> Among other enhancements, Rosenfeld's presentence investigation report added a two-level increase for obstruction of justice based on Rosenfeld's misleading trial testimony that he had served as an expert for the government. Rosenfeld asserted that his testimony was made in good faith, arguing that he never used the word "testify" on direct examination and had only answered the government's questions on cross. The government argued that Rosenfeld deliberately attempted to deceive the jury into believing he had testified as an expert witness for the government, and the district court agreed.

Holland, 722 F. App'x at 924-25. Thus, this Court determined that the correct total offense level for Rosenfeld was 29 and the Criminal History Category was I, resulting in an advisory sentencing range of 87 to 108 months in prison. Sentencing Tr. Vol. II at 10; see also Sentencing Tr. Vol. III at 4-5. Ultimately, the Court varied below the guidelines range and sentenced Rosenfeld to concurrent terms of 60 months in prison on each count, followed

by a 3-year term of supervised release. Sentencing Tr. Vol. III at 47, 48; (Crim. Doc. 446, Judgment).

Rosenfeld appealed his conviction and sentence to the Eleventh Circuit Court of Appeals. Rosenfeld raised seven arguments: (1) that the Court abused its discretion by admitting evidence of uncharged fraudulent transactions; (2) that the Court abused its discretion by allowing the government's expert witness to testify; (3) that the Court abused its discretion "by refusing to allow their 'key' witness to testify as either an expert or lay witness"; (4) that the Court improperly calculated the forfeiture amount; (5) that the Court "erred by not limiting the government's interest in his home to the mortgage payment shown to be tainted by the proceeds of the fraud"; (6) that the imposition of both a money judgment and the forfeiture of his home violated the Eighth Amendment's Excessive Fines Clause; and (7) that the Court erred in imposing the obstruction-of-justice enhancement. Holland, 722 F. App'x at 925. The Eleventh Circuit rejected each of these arguments, affirming his conviction and sentence. Id. at 926-31.

Rosenfeld did not petition the United States Supreme Court for a writ of certiorari, at which point his conviction and sentence became final. Rosenfeld then timely initiated these § 2255 proceedings. Rosenfeld raises three claims of ineffective assistance of counsel against his attorney, Mitchell A. Stone, based on decisions counsel made before or during trial, and one claim that the Court lacked subject matter jurisdiction over the criminal proceedings.

## II. Discussion

Pursuant to Title 28, United States Code, Section 2255, a person in federal custody may move to vacate, set aside, or correct his sentence. Section 2255 permits such

collateral challenges on four specific grounds: (1) the imposed sentence was in violation of the Constitution or laws of the United States; (2) the court did not have jurisdiction to impose the sentence; (3) the imposed sentence exceeded the maximum authorized by law; or (4) the imposed sentence is otherwise subject to collateral attack. 28 U.S.C §2255(a) (2008). Only jurisdictional claims, constitutional claims, and claims of error that are so fundamentally defective as to cause a complete miscarriage of justice will warrant relief through collateral attack. United States v. Addonizio, 442 U.S. 178, 184-86 (1979). A petitioner's challenge to his sentence based on a Sixth Amendment claim of ineffective assistance of counsel is normally considered on collateral review. United States v. Teague, 953 F.2d 1525, 1534 n.11 (11th Cir. 1992).

As with any Sixth Amendment ineffective assistance of counsel claim, a § 2255 petitioner must demonstrate both: (1) that his counsel's conduct amounted to constitutionally deficient performance, and (2) that his counsel's deficient performance sufficiently prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); Weeks v. Jones, 26 F.3d 1030, 1036 (11th Cir. 1994). In determining whether the petitioner has satisfied the first requirement, i.e. that counsel performed deficiently, the Court adheres to the standard of reasonably effective assistance. Weeks, 26 F.3d at 1036. The petitioner must show, in light of all the circumstances, that counsel's performance fell outside the "wide range of professionally competent assistance." Id. To satisfy the second requirement, that counsel's deficient performance prejudiced the defendant, the petitioner must show that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. Id. at 1036-37 (citing Strickland, 466 U.S. at 694). In determining whether a petitioner has met the two prongs of deficient performance

and prejudice, the Court considers the totality of the evidence. <u>Strickland</u>, 466 U.S. at 695. However, because both prongs are necessary, "there is no reason for a court… to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." <u>Id.</u> at 697; <u>see also</u> <u>Wellington v. Moore</u>, 314 F.3d 1256, 1261 n. 1 (11th Cir. 2002) ("We need not discuss the performance deficiency component of [petitioner's] ineffective assistance claim because failure to satisfy the prejudice component is dispositive.").

## A. Ground One: Counsel's disclosure of documents before trial

In Ground One, Rosenfeld alleges that counsel gave ineffective assistance by disclosing "confidential" documents to the government before trial. Amended § 2255 Motion at 4, 13-15. Specifically, Rosenfeld claims that counsel "violated attorney-client privilege by providing confidential documents outlining defendant's defense to the government prior to trial and by revealing confidential discussions regarding defendant's contributions to an unrelated Secret Service investigation during defendant's trial testimony." <u>Id.</u> at 13.[5] In his Third Declaration, Rosenfeld identifies six documents that he claims were confidential, and which counsel disclosed to the United States: (1) a document named "Mischaracterization of the Unistate CD as an Investment Vehicle," (2) a document named "FINRA Registrations & Licenses are not required for Holland & Rosenfeld," (3) a document named "DTC[6] Issues resolved – Details," (4) a document named "Review of

---

[5]     Counsel's alleged ineffectiveness for disclosing Rosenfeld's involvement in a Secret Service investigation, which led to the obstruction-of-justice enhancement and the discovery of additional fraudulent transactions, is addressed in Ground Two.
[6]     DTC stands for Depository Trust Company, which is a highly-regulated private company that operates as a clearinghouse for international transactions.

Unistate Agreement," (5) a document named "CUSIP[7] Allegation Issues Resolved," and (6) a document named "Summary of Fraudulent $200 M CD to Sayar." Third Declaration at ¶ 3. Each document is attached to the Third Declaration. (Civ. Doc. 14-1, Attachments). These documents were included in Rosenfeld's exhibit list, along with 688 other exhibits, as exhibit numbers 474, 462, 158, 466, 192, and 28, respectively. (Crim. Doc. 173, Rosenfeld's Exhibit List). The first five documents contain Rosenfeld's impressions, interpretations of the evidence, or summaries of events. The sixth document – the "Summary of Fraudulent $200 M CD to Sayar" – was not produced by Rosenfeld at all but one of the victims himself, George Sayar. None of the six documents were admitted into evidence at trial. See id.

Rosenfeld asserts that counsel's disclosure of the documents to the government prejudiced him by "prevent[ing] defendant from presenting a cognizable defense strategy" and "allowing new testimony and evidence to be introduced by the government that vitiated defendant's trial testimony and compromised defendant's credibility with the jury...." Amended § 2255 Motion at 13. Rosenfeld contends that counsel's actions "allow[ed] the government to craft the prosecution of their case in chief with foreknowledge of defendant's private knowledge and insight into the underlying issues of the case, resulting in witness' [sic] trial testimony that would have been slightly different or never made had Stone kept the six (6) confidential documents private." Id. at 14. However, Rosenfeld can only speculate that the documents' disclosure affected the government's strategy. Rosenfeld

---

7       CUSIP stands for Committee on Uniform Securities Identification Procedures. Each registered security has a unique CUSIP number. Part of the evidence that the financial instruments in this case were fraudulent was that the instruments had false or invalid CUSIP numbers. (Crim. Doc. 381, Trial Tr. Vol. IV at 272-74); accord Indictment at 5, 9-10, 19.

does not identify any evidence of a causal relationship between the disclosure of these documents and the government's trial strategy.

The United States responds that "Rosenfeld's precise claims are general and somewhat difficult to parse, but seem to focus on documents that defense counsel provided to the government immediately before and during trial…." Response at 8. The United States argues that "[t]he record does not support Rosenfeld's claims." Id. at 4. According to the United States,

> Defense counsel did not provide reciprocal discovery and provided large binders of exhibits to the government <u>for the first time at the trial</u>. The government objected. The late provided discovery was not excluded from evidence. The late disclosure of discovery and exhibits continued throughout the trial, thus putting the government at a disadvantage.

Id. at 8 (emphasis added). (<u>Accord</u>, <u>e.g.</u>, Crim. Doc. 382, Trial Tr. Vol. V at 201-02) (Prosecutor: "Mr. Shorstein – first of all, 600 exhibits. I have not received one from Mr. Stone. He promised them at 9:00 a.m. today. I don't have one, not one."). Thus, the United States argues that counsel's tactic of deluging the government with last-minute discovery disadvantaged the prosecution, not the other way around.

The Court will assume, for the sake of discussion only, that counsel erred by disclosing the six documents to the prosecution. Nevertheless, Rosenfeld has failed to show that he was prejudiced under <u>Strickland</u> because there is not a reasonable likelihood that the last-minute disclosures affected the outcome of the trial. Notably, none of the six documents that Rosenfeld complains about were ultimately admitted into evidence. <u>See</u> Rosenfeld's Exhibit List, Exhibit Nos. 28, 158, 192, 462, 466, 474. Moreover, Rosenfeld does not point to any example where disclosure of the six documents actually caused the government to adopt new arguments, or to introduce new or different testimony, compared

to its original strategy. Instead, Rosenfeld presents only his self-serving speculation.[8] Based on the record, it is doubtful the government even had a meaningful opportunity to review any of the six documents in detail. These documents were merely six files scattered throughout Rosenfeld's list of 694 exhibits, and Rosenfeld inundated the government with discovery at the last minute. Thus, it is implausible that the government reshaped its trial strategy based on the eleventh-hour disclosure of these six documents, buried as they were among 688 other exhibits.

Additionally, the evidence that the government introduced at trial mirrored the allegations in the Indictment and what the government said it would prove in its pretrial memorandum (Crim. Doc. 132, United States' Trial Brief Concerning Rule 404(b) Evidence). This reinforces the conclusion that the late disclosures did not influence the government's strategy. At trial,

> The Government presented evidence that Defendants Holland and Rosenfeld worked together over a period of more than two years defrauding business people in severe financial difficulty. They did so by purporting to facilitate arrangements whereby the victims could "rent" financial instruments, which supposedly would enable the victims to obtain financing based upon their apparent ownership of the instruments. Moreover, the Government presented evidence adequate to prove that the instruments were not real. However, even if the instruments had been genuine, the "rental" agreements were specious. Not one of the transactions pertinent to the instant case resulted in the customer's obtaining the financing sought. Furthermore, the only way that a victim could have succeeded in finding some source of financing to provide funds based on such a leased instrument would have been to mislead the source into believing that the

---

[8]     In his Reply brief, Rosenfeld attempts to identify examples of how he believes the disclosure of the documents affected the government's strategy. Reply at 4-6. But several of the examples allege that the documents' disclosure caused the government to not prosecute certain allegations in the Indictment, id., which could not have prejudiced Rosenfeld. The other example relates to technical details about the fake CUSIP numbers on the instruments, id. at 5, which likely did not affect the outcome of the trial given the totality of two weeks' worth of testimony. Additionally, the government had maintained since the Indictment that the fraudulent financial instruments bore fake CUSIP numbers, see Indictment at 5, 9-10, 19, and the record does not support the notion that the disclosures affected the government's case in this regard.

"rented" instrument provided some genuine security. In sum, using the analogy presented by Rosenfeld's counsel in his opening statement, the "deal" was equivalent to renting an expensive car for an evening to attend one's high school reunion and appear prosperous so as to facilitate obtaining loans from former classmates.

The evidence was adequate to enable a reasonable jury to find that Defendants Holland and Rosenfeld knew that the "rented instrument scheme" was utterly baseless. Indeed, Defendants Holland and Rosenfeld, who supposedly were entitled to millions of dollars in the event that a victim actually obtained the financing sought, once they obtained their profits for arranging the "rental," had little or no interest in the victim's efforts to obtain the financing. In sharp contrast, the evidence established that co-Defendant Hedrick actually believed (albeit unreasonably) that the leased instruments procured by Defendants Holland and Rosenfeld could be "monetized," and he engaged in extensive – albeit fruitless – efforts to obtain funding for the victims. The jury, quite justifiably, found Hedrick not guilty of the conspiracy charge while convicting Defendants Holland and Rosenfeld.

(Crim. Doc. 207, Order Denying Rosenfeld's Motion for Judgment of Acquittal at 2-4). This evidence aligns with what the United States said it would prove well before the six documents were disclosed. <u>Compare</u> Indictment; United States' Trial Brief Concerning Rule 404(b) Evidence.

Rosenfeld's claim that counsel's disclosure of the six documents "prevented [him] from presenting a cognizable defense strategy," or that it influenced the government's trial strategy, is speculative and unfounded. And speculative allegations are not enough to warrant an evidentiary hearing, let alone habeas relief. <u>Tejada v. Dugger</u>, 941 F.2d 1551, 1559 (11th Cir. 1991). The record further shows that there is not a reasonable probability that counsel's disclosure of the six documents affected the outcome of the trial.[9] As such, Rosenfeld's claim of ineffective assistance in Ground One is due to be denied.

---

[9]     Rosenfeld also suggests that counsel's disclosure of the six documents was ineffective <u>per se</u>, such that the Court must presume prejudice under <u>United States v. Cronic</u>, 466 U.S. 648 (1984). Amended § 2255 Motion at 13; Reply at 11-14. This argument merits little discussion. The category of ineffective assistance claims where prejudice is presumed is narrow. <u>See</u> <u>Purvis v. Crosby</u>, 451 F.3d 734, 740 (11th Cir. 2006) ("The Supreme Court in <u>Strickland</u> instructed us that

**B. Ground Two: Counsel's questioning of Rosenfeld about his involvement in a Secret Service investigation**

In Ground Two, Rosenfeld alleges that counsel gave ineffective assistance by asking Rosenfeld on direct examination about his involvement in a prior Secret Service investigation. Amended § 2255 Motion at 5, 16-18. Specifically, Rosenfeld claims that counsel "violated attorney-client privilege by revealing confidential discussions regarding defendant's contribution to an unrelated Secret Service investigation during defendant's trial testimony." Id. at 16. Rosenfeld gave false testimony about his role in the Secret Service investigation, leading to an obstruction-of-justice guidelines enhancement and the discovery of three additional, uncharged fraudulent transactions, one of which was added to the loss amount.

On direct examination, Rosenfeld stated that in late 2008 he was "contacted by a Secret Service agent that was looking for expert witnesses." (Crim. Doc. 163, Rosenfeld Testimony Excerpt at 5). The United States objected because this matter had not been disclosed before trial. Id. The Court allowed Rosenfeld to testify about the matter, and Rosenfeld went on to state that he had a brief acquaintance with a Secret Service agent named Mike Purcell. Id. at 6-7. According to Rosenfeld, he used his business knowledge to assist Agent Purcell in investigating suspicious banking instruments supplied by a company named Apogee. Id. Rosenfeld also testified that he assisted Agent Purcell in canceling a "proof-of-funds" transaction involving Apogee, and in doing so obtained a

---

in all but three exceptional circumstances prejudice must be shown before an ineffective assistance of counsel claim merits relief."). Prejudice is presumed only where (1) the defendant has been actually or constructively denied the assistance of counsel at a critical stage, (2) where the state has interfered with the assistance of counsel, or (3) where counsel "is burdened by conflicting interests arising from multiple representation" that affect counsel's performance. Id. at 740-41. Rosenfeld's counsel capably represented him through two weeks of trial and sentencing. Rosenfeld's allegations fall far short of establishing per se ineffective assistance.

refund for a customer. Id. at 7-8. On cross-examination, Rosenfeld further testified that law enforcement had approached him to serve as an expert witness in the Apogee case, and that he testified as a "material witness" in a federal court in Queens, New York. Id. at 10. But

> [w]hen pressed further on the matter, Rosenfeld conceded that he did not testify in court, was not even in New York when the trial in question happened, and claimed that he only used the term "expert" on direct because he was answering questions about his industry in an interview with a federal prosecutor.

Holland, 722 F. App'x at 924.

The government located Agent Purcell over the intervening weekend and called him as a rebuttal witness when the trial resumed. (See Crim. Doc. 387, Trial Tr. Vol. X at 19-49). Agent Purcell testified that he contacted Rosenfeld in late 2008 as a person of interest in an investigation about suspicious banking activities, not as an expert witness. Id. at 19-29. Agent Purcell's testimony further revealed that Rosenfeld had been involved in three additional uncharged fraudulent transactions pertaining to Apogee. See id. at 28-31. The three transactions involved worthless proof-of-funds letters, with the victims being identified as Gary Snisky, Dimarco Holdings, and Paloma Partners. Id.; see also Gov't Exs. 46A, 47A, 48A. Of those three transactions, the one involving Gary Snisky was added to the calculation of the loss amount, raising the figure by $247,000, or from $3,565,077 to $3,812,077. See Restitution Amount Finding (Crim. Doc. 238).

Rosenfeld faults counsel for the ensuing obstruction-of-justice enhancement and increase in the loss amount. Rosenfeld claims he and his attorney had agreed during pretrial discussions that counsel would not ask him about his involvement in the Apogee case. Amended § 2255 Motion at 16; First Declaration at ¶ 3. Rosenfeld asserts that

counsel failed to notify or prepare him that he would be asking such questions, "forcing" him to testify about his "contribution" to the Secret Service investigation "without the benefit of being able to research the details of an event that occurred in 2008 and 2009." Amended § 2255 Motion at 17. Rosenfeld claims he was prejudiced because the line of questioning led to the 2-level obstruction-of-justice enhancement, the discovery of three additional uncharged fraudulent transactions, and an increase in the loss amount.[10] In short, Rosenfeld blames counsel for the consequences of his false testimony.

The trial record refutes Rosenfeld's claim. Contrary to his allegations, the record shows that Rosenfeld readily testified about his purported role in the Apogee investigation. As the United States observes, counsel asked Rosenfeld an "open-ended question" and Rosenfeld himself supplied the false answers. Response at 9. The following exchange occurred between defense counsel and Rosenfeld:

| STONE: | Okay. Let me ask you a question concerning your business practice in the – in this area. |
|---|---|
| | Have you been in – have you been involved in any deals that ultimately there was something revealed that demonstrated that the deal was not good? |
| ROSENFELD: | Yes. |
| STONE: | Okay. Can you tell us about an example of that? |
| ROSENFELD: | Yeah. In approximately – I'd have to look for the exact dates – late 2008, perhaps December, but late 2008, I was contacted by a Secret Service agent that was looking for expert witnesses in the area that I was – |

---

[10] With regard to the loss amount, Rosenfeld incorrectly claims that his testimony led to the discovery of both the $247,000 transaction involving Gary Snisky <u>and</u> a $664,577 fraudulent transaction involving a company called Promotora Inmobilaria. Amended § 2255 Motion at 18. In truth, only the $247,000 Gary Snisky transaction was added to the loss amount as a result of Rosenfeld's testimony. The government was already aware of the Promotora Inmobiliaria transaction, as reflected by that transaction's inclusion in the United States' pretrial memorandum. United States' Trial Brief Concerning Rule 404(b) Evidence at 5, ¶ 7 (Crim. Doc. 132).

| | |
|---|---|
| DUVA: | Objection. May we approach, Your Honor? |
| COURT: | Yes, of course. |

***

| | |
|---|---|
| STONE: | So were you – did you receive contact about something? |
| ROSENFELD: | Yes. |
| STONE: | And what was that? |
| ROSENFELD: | They were trying to find people in the industry who had some knowledge that could explain how the business worked. |

Rosenfeld Testimony Excerpt at 5-6. Rosenfeld went on to describe his interactions with Agent Purcell, how he allegedly used his expertise to assist Agent Purcell with the Apogee investigation, and how Rosenfeld testified as an expert or a "material witness" at a federal trial in Queens, New York (which turned out to be false). Id. at 6-11.

Far from being unwilling and unprepared to present this testimony, the record demonstrates that Rosenfeld provided the false testimony of his own accord. Defense counsel's initial questions did not suggest the answer and certainly did not compel Rosenfeld to testify falsely as he did. Rather, without hesitation, Rosenfeld himself offered the false statements.

Indeed, it appears that Rosenfeld's testimony about being a purported expert was designed to convince the jury of his legitimacy in the financial world. Similar to a decision on which witnesses to call, the decision on what testimony to elicit from a witness is a quintessentially strategic one. See Evans v. Sec'y, Fla. Dep't of Corr., 699 F.3d 1249, 1268 (11th Cir. 2012) ("Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess."). The

transcript shows that Rosenfeld was a willing participant in the strategy to portray himself as a person knowledgeable in the business of unconventional financing.[11] As the government concedes, "[t]his tactic could have even worked in Rosenfeld's favor had the government been unable to locate and call Agent Purcell to the witness stand." Response at 12. But the government was able to track down Agent Purcell and the strategy backfired on Rosenfeld. That the strategy ultimately failed, however, does not establish that counsel gave ineffective assistance. Strickland, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential" because "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."). The Court is "not permitted to use the benefit of hindsight to conclude that [counsel] should have known his … strategy would be unsuccessful." Dingle v. Sec'y, Dep't of Corr., 480 F.3d 1092, 1100 (11th Cir. 2007).

Simply put, Rosenfeld himself chose to provide false testimony. Counsel did not force Rosenfeld to provide false answers to open-ended questions. The testimony was a tactical gambit that eventually backfired, but Rosenfeld cannot escape the consequences of his own actions by shifting the blame to his attorney. Because the trial record affirmatively contradicts Rosenfeld's allegations, relief as to the claim in Ground Two is due to be denied.

---

[11]    Rosenfeld does <u>not</u> allege that defense counsel knew his testimony about his role in the Apogee case was false. Nor does he claim that counsel failed to explain the consequences of committing perjury. Rather, the essence of Rosenfeld's claim is simply that he and defense counsel had agreed they would not introduce testimony about Rosenfeld's involvement in the Apogee investigation and that Rosenfeld was unprepared to give such testimony. As explained above, however, the record refutes this claim.

**C. Grounds Three and Four: Whether the Court lacked subject matter jurisdiction and whether counsel was ineffective for not raising the objection**

In Ground Three, Rosenfeld claims that the Court lacked subject matter jurisdiction over the criminal case because the Assistant United States Attorneys (AUSA's) who signed the Indictment, A. Tysen Duva and Karen Gable, were not validly appointed AUSA's. Amended § 2255 Motion at 7, 19-20. In Ground Four, Rosenfeld claims that counsel was ineffective because he failed to object to the alleged absence of jurisdiction. Id. at 8, 21-22.

This claim is frivolous. Mr. Duva and Ms. Gable are duly-appointed AUSA's, as reflected by the appointment affidavits contained in the record. Mr. Duva's appointment affidavit shows that he was sworn into office on August 19, 2007. First Declaration at 15. Ms. Gable's appointment affidavit shows that she was sworn into office on May 1, 1994. Amended Second Declaration at 6. Neither affidavit suggests that Mr. Duva's or Ms. Gable's appointments as AUSA's expired at a certain date thereafter.

In any event, the Court's subject matter jurisdiction existed independently of Mr. Duva's or Ms. Gable's appointments. "So long as the indictment charges the defendant with violating a valid federal statute as enacted in the United States Code, it alleges an 'offense against the laws of the United States' and, thereby, invokes the district court's subject-matter jurisdiction" under 18 U.S.C. § 3231. United States v. Brown, 752 F.3d 1344, 1354 (11th Cir. 2014) (citing Alikhani v. United States, 200 F.3d 732, 734-35 (11th Cir. 2000)). Here, the Indictment charged Rosenfeld with conspiracy to commit wire fraud and substantive wire fraud, in violation of 18 U.S.C. §§ 1343, 1349, and 2 – each one a criminal statute in the United States Code. By doing so, the Indictment did all that was

necessary to give the Court subject matter jurisdiction over the offenses for which Rosenfeld was convicted. <u>Brown</u>, 752 F.3d at 1354. Even if the indictment had not been "be[en] signed by an attorney for the government," as required by Fed. R. Crim. P. 7(c)(1), such a defect would have been a technical one, which would not have deprived the Court of subject matter jurisdiction. <u>See</u> <u>United States v. Duval</u>, 604 F. App'x 910, 910 (11th Cir. 2015) ("The purported absence of the foreperson's signature was 'a mere technical irregularity,' <u>Hobby v. United States</u>, 468 U.S. 339, 345, 104 S. Ct. 3093, 3096, 82 L. Ed. 2d 260 (1984), that did not affect the authority of the district court to enter its judgment.") (citing <u>United States v. Cotton</u>, 535 U.S. 625, 630 (2002)). Thus, Rosenfeld's argument that the Court lacked subject matter jurisdiction lacks merit in law and fact.

Likewise, defense counsel did not render ineffective assistance by not objecting to the absence of subject matter jurisdiction because such an argument would have been frivolous. <u>See</u> <u>Chandler v. Moore</u>, 240 F.3d 907, 917 (11th Cir. 2001) (attorney did not render ineffective assistance by deciding not to raise a meritless issue). Therefore, Rosenfeld's claims in Grounds Three and Four are due to be denied.

## III.     Certificate of Appealability Pursuant to 28 U.S.C. § 2253(c)(1)

If Rosenfeld seeks issuance of a certificate of appealability, the undersigned opines that a certificate of appealability is not warranted. This Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Rosenfeld "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," <u>Tennard v. Dretke</u>, 542 U.S. 274, 282 (2004) (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)), or that "the issues presented were

'adequate to deserve encouragement to proceed further,'" <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335–36 (2003) (quoting <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 n.4 (1983)).

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. <u>See</u> <u>Slack</u>, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." <u>Id.</u> Upon consideration of the record as a whole, this Court will deny a certificate of appealability.

As such, and in accordance with the Rules Governing Section 2255 Cases in the United States District Courts, it is hereby

**ORDERED**:

1. Petitioner Warren Rosenfeld's Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (Civ. Doc. 9) is **DENIED**.

2. The Clerk shall enter judgment in favor of the United States and against Warren Rosenfeld, and close the file.

3. If Rosenfeld appeals the denial of the petition, the Court denies a certificate of appealability. Because this Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such

termination shall serve as a denial of the motion.

**DONE AND ORDERED** at Jacksonville, Florida this 22nd day of January, 2020.

MARCIA MORALES HOWARD
United States District Judge

lc 19

Copies:
Counsel of Record
Pro se petitioner